## STEWART MINING COMPANY *v.* COULTER ET AL.

ACCIDENT AND SURPRISE AS GROUNDS FOR A NEW TRIAL.—A new trial will not be granted on the ground of accident and surprise to a party who by the exercise of ordinary diligence might have avoided the effects of what he complains of as the grounds of his surprise.

ID.—The affidavits used on the hearing in this case examined and held not to have made such a case of accident and surprise as entitled the defendant to a new trial.

APPEAL from the third district court. The opinion states the facts.

*R. N. Baskin,* for the appellant.

*Bennett & Harkness,* and *Marshall & Royle,* for the respondent.

TWISS, J.:

This is an action to recover possession of a mining claim described in the complaint, and for an injunction restraining the defendants from entering said mine, and from mining or extracting or removing any minerals, ores, and from interfering in any way with plaintiffs possessing the same.

The defendant demurred, and assigned as ground of demurrer that the complaint did not state facts sufficient to constitute a cause of action; and answered specifically, denying the several allegations of complaint. The demurrer was overruled, and on trial the court found all the issues for the plaintiff, and on the tenth day of November, 1880, judgment accordingly was rendered.

On December 7th defendant Coulter gave notice of his intention to move for a new trial, based upon the ground of "accident and surprise, which ordinary prudence could not guard against; the facts relating to which are fully set forth in the affidavits herewith filed."

The court overruled the motion. The only question before this court is, Did the court below err in refusing a new trial? In the affidavits relied upon, reference is made to certain letters and telegrams therewith filed, among which is a letter from Harmer to Coulter, bearing date September 22, 1880, in which he says: "Since the arrangement was made with you Smith, and Hill, I was relieved of any expense until final issue

in the supreme court;" this letter inclosed a letter from defendants' attorneys in this and several other cases, dated Salt Lake City, September 22, 1880, directed to I. C. Harmer, Esq., Bingham, Utah, stating that this case was set for November 8, 1880, and that it would be on that day "called peremptorily for trial," and proceeded: "We write this early to notify you that if any defense is to be made, that it will be necessary now to take steps at once to procure the attendance of witnesses, experts, etc. As you are aware, this will cost money, and we did not know whether you were prepared or not, and we do not know who else to advise with, except yourself. The plaintiffs announced themselves ready for trial, and insisted on trials, which of course we could not resist, but got the cases put off as far as possible, in order to give ample time for preparation.

"Will you be kind enough to communicate with the other parties in interest, and learn whether they are willing to put up the funds necessary for the trials? Of course you know that trials will be costly, and that it will be useless to attempt to try the cases without the proper funds for expenses of trial, witnesses, etc. Please give your attention to this at once, and advise us of your determination in the matter.

"Very truly yours,
"ROSEBOROUGH & MERRITT.
"SUTHERLAND & McBRIDE."

These letters were received, as appears by the affidavit of Harmer, a part of which is as follows: "On the twenty-ninth of September, 1880, I received the following telegram from Mr. Coulter:

"'NEW YORK, Sept. 29, 1880.
"'I. C. HARMER, Bingham.

"'Have yours of 22d. Please telegraph me at Brevoort House here how much money will probably be required for third trial referred to?      GEO. T. COULTER.'

"I immediately advised with the counsel, and on September 30, 1880, sent the following telegram to Coulter:

"'BINGHAM, Sept. 30, 1880.
"'G. T. COULTER, Brevoort House, New York City.

"'Had to see counsel before answering. Two important experts from Idaho have to be got; probable cost, including

counsel fee, not less than six thousand dollars.    Counsel want an answer so as to commence preparations.

"'I. C. HARMER.'

" To this dispatch I never received an answer, but on the fifteenth or sixteenth of October I received a letter from H. C. Hill, dated Frisco, October 14, 1880, in which he stated that if nothing unforeseen occurred he would be in Salt Lake on Sunday night (the 17th), and would remain Monday and Tuesday, solely to arrange about the suit between Edison and Stewart, and requested me if possible to meet him on Monday, the eighteenth of October, 1880, and to arrange an interview with counsel beforehand.    Accordingly I arranged for an interview with counsel for the eighteenth of October, 1880, at the office of Roseborough & Merritt; on the eighteenth of October Mr. Hill, James Clark, and myself went to the office of Roseborough & Merritt.

"Immediately at the opening of the interview Mr. Hill announced that if the trial were to cost six thousand dollars Mr. Coulter would abandon the lawsuits; that Coulter had lost large sums of money in the Little Pittsburgh stock; that the late R. T. Smith had not rendered his accounts showing the amount disbursed by him; and that Coulter was not disposed to pay out any more money.    *    *    *    Afterwards it was finally agreed that we would try and get along with five thousand dollars, of which sum two thousand dollars was to be paid to counsel, and three thousand dollars for witnesses, experts, reporter, jury, and other expenses incident to hotly contested mining cases.    During the interview Mr. Hill asked one of the counsel, Mr. Merritt, whether the counsel fees were required in advance, and he was distinctly and emphatically answered in the affirmative, and could not have misunderstood the answer; and he left the office with this distinct understanding.    He agreed to telegraph Mr. Coulter, and I went with him to the telegraph office for that purpose, and saw him fill up a message-blank and hand it to one of the operators.

"I heard nothing further from Mr. Hill until about the twenty-fifth of October, the counsel in the mean time urgently protesting that they would withdraw if they were not paid, when I received from Mr. Hill a letter dated October 14,

1880, in which he stated that 'Coulter writes me that he will provide funds for the suit; that he (Hill) had sent Clark one hundred dollars out of his (Hill's) own pocket again for expenses of witnesses to Bingham;' and further on he says: 'I have faint hopes of ever getting any other money out of Coulter, and do hope this suit will give a decision that will prevent me asking for it.' A few days after I wrote to Hill, telling him that the case set for the first of November had been dismissed by plaintiffs at their own cost, and calling his attention to the necessity of vigorous preparations for the trial of the case set for the eighth of November. On the first or second of November I received a letter from Hill, dated October 31st, in which he says that he had written to Coulter and was waiting for his answer, hoping for a remittance, and stating that he (Hill) had sent Clark one hundred dollars for witnesses, and if that was all gone must send one hundred dollars more, 'only, as you know, I am not in any way pecuniarily interested in this matter. Let it go as it may, I can't hope to get anything out of it; and as I have hard work to get money, I do dislike to throw good dollars after so many bad ones.'

" To this letter I replied, under date of the fourth of November, telling Hill that it was absolutely necessary for him to be here in advance of the trial, or to appoint some one here to disburse the money. To this letter he made no reply, but we were informed through a gentleman from Milford that Hill would be here on the sixth or seventh of November, but Hill did not come. The eighth of November arrived, the day set for the trial of the most important case. I had heard nothing from Hill or Coulter, no funds had been provided in accordance with my contract with Coulter; the counsel had not been paid, as Hill had been distinctly informed on October 18th, which would be required in advance of the trial; counsel were unwilling to proceed, as they were not only without their fees, but would become liable for the jury and reporters' fees in case the trial had proceeded. In this dilemma an adjournment for a day was procured, and after waiting till about two o'clock of that day, hoping for some news from Coulter or Hill, I sent the following dispatch to Coulter:

"'SALT LAKE, Nov. 8, 1880, 2:46 P. M.

"'GEO. T. COULTER, Brevoort Hotel, New York.

"'Case called. Attorneys will withdraw without money. If no money by ten o'clock to-morrow, give me the title back, and I will manage for myself.      I. C. HARMER.'

"At five minutes to ten A. M. of the ninth of November, I received the following reply, addressed, however, to T. Chambers:

"'NEW YORK, Nov. 9, 1880, 8:09 A. M.

"'To T. CHAMBERS.

"'Will telegraph money to-day. Had no idea it was urgent [so urgent].      GEO. T. COULTER.'

"After the receipt of this dispatch I again procured an adjournment of the case to ten o'clock A. M. of November 10, 1880; hoping and expecting that the money would arrive on the ninth, as Coulter had telegraphed, but at 11:45 of that day I was surprised by receiving the following telegram:

"'NEW YORK, Nov. 9, 1880, 11:05 A. M.

"'To T. CHAMBERS.

"'I telegraphed H. C. Hill last night to draw on me at sight. Will this do, or shall I telegraph money?

"'GEO. T. COULTER.'

"At 1:15 on the same day I sent the following reply:

"'SALT LAKE, Nov. 9, 1880.

"'To GEO. T. COULTER, Brevoort Hotel, N. Y.

"'Nothing but money here forthwith will secure defense —delay fatal. Instantly pay, compromise, or abandon. Five thousand offered for compromise. Answer immediately.

"'I. C. HARMER.'

"I will remark here that the Stewart company had, during these adjournments, offered five thousand dollars by way of compromise, or rather, that I would withdraw from the case, and I deemed it my duty to apprise Mr. Coulter of the fact. I wanted and hoped to receive an answer immediately. Nothing came in reply during the night of November 9th. On the morning of the tenth we could hope for no further indulgence from the court, by way of further postponement, as other cases were pressing; we had either to try the case or quit. On the morning of. the tenth, knowing that the time

in New York was more than two hours earlier than here, and having besieged the telegraph office till ten A. M. (time here), and inquired of the banks repeatedly if any money had been telegraphed by Coulter or Hill, and receiving neither reply or advices of money, at 10:25 A. M. the counsel withdrew from the cases, and the plaintiffs took such action as they saw proper."

J. B. Roseborough, of the firm of Roseborough & Merritt, in his affidavit says that at the interview at their office on the eighteenth of October, spoken of by Harmer in his affidavit, "Mr. Hill asked Mr. Merritt if the two thousand dollars attorneys' fees were to be paid in advance before the trial, and Mr. Merritt answered positively, "Yes, before the cases come to trial."

Mr. Roseborough further in his affidavit says: "The case set for the eighth having been continued over from day to day until the tenth of November, both Mr. Coulter and Mr. Hill, and also Mr. Clark, were most positively informed that the attorneys would withdraw unless the two thousand dollars fee for the trial was paid; and they had ample time to provide for the payment of that money. As the hour for convening of the court on the tenth arrived, my partner, Mr. Merritt, went down to the telegraph office, to the Deseret National Bank, and to Wells, Fargo & Co.'s Bank, and inquired if any telegram, or telegraphic transfer of money, had been received from Mr. Coulter up to that hour, and was informed at each place that there had not been; and I particularly requested the agents at the telegraph office and at each of said banks, in case there was any such telegram or telegraphic transfer from Mr. Coulter, to send the information immediately to the court-room; and I repaired to the court-room a few minutes after ten o'clock. There was a delay on account of intervening business or motions until about twenty-five minutes past ten o'clock, when the case set for that day was called, and I thereupon arose and stated to the court that my firm withdrew from that case, and all other cases between the same parties in court, and that I deemed it proper for myself, and out of respect to the court, to state that the reason we withdrew at that late day was in order to give the defendants, or the defendant who was to pay the attorneys' fees in this case, every opportunity to perform the

agreement on his part, and that he had not performed his part, and we therefore withdrew from the cases. I had been informed in the course of the litigation before this, that Mr. Harmer had transferred all his interest in the property in litigation to the defendant Coulter, and Coulter, in consideration thereof, had undertaken to pay the attorneys' fees, and other expenses of the litigation. After we had withdrawn from the cases and returned to our office, at fifty minutes after ten o'clock, Mr. Dooley, agent of Wells, Fargo & Co., came to our office in haste, and stated that he had just received a telegraphic transfer of two thousand dollars from George T. Coulter for us. I immediately pointed to the clock, and called Mr. Dooley's attention—it was then just ten minutes to eleven o'clock—and told him that he was too late, and we declined to accept the remittance, for the reason that we had after due notice to Mr Coulter withdrawn from the cases in open court that morning. I never had any communication or conference with the plaintiff or its attorneys in regard to Mr. Harmer withdrawing from the cases, or for any terms on his behalf, pending the continuance of the cases from the eighth to the tenth of November. I had heard that the plaintiff had offered five thousand dollars to Mr. Harmer, and upon hearing that, I went and informed Harmer of what I had heard, saying to him that he could do as he pleased about the matter, that we would withdraw from the cases unless our fees were paid before the trials were entered upon, and that in that case we had nothing to say and no charge to make, and did not receive any further money."

From the numerous affidavits, telegrams, and letters filed in support of the motion for new trial, it is evident that Harmer claimed to be a part owner of the mining property in controversy, and conveyed a large share of his interest to Coulter, who in part payment therefor agreed to pay and defray all the expense of the preparation for and the trial of the cases against Harmer and others affecting or in any way involving the right to these mining claims, and that Coulter was thereupon made party defendant in these cases. It also clearly appears that as early as September 30, 1880, he was informed that his attorneys, and Hill, his agent, and his co-defendant Harmer, were of the opinion that at least five thousand dollars would be required to pay all expenses of witnesses,

experts, reporter, and attorneys' fees, which were to be *paid in advance*, and the incidental expenses of preparation for trial; and that the trial of this case was set for the eighth day of November. With all of these facts fully known to him, ordinary business prudence would seem to have required that he furnish his agent, his co-defendant, or his attorneys the necessary means to prepare the case for trial, by the necessary examination of the mine by the proper experts, and to secure the attendance of his witnesses, and the services of the counsel in the case, beyond doubt. He did neither one of these things, any one of which is esential to a fair trial of a mining case like this. The case at the time it was called for trial was postponed from the eighth to the ninth, and from the ninth to the tenth, of November, on the application of the defendants' attorneys, in expectation that Coulter would pay the attorneys the compensation known by him to be required by them before entering upon the trial; he being duly informed of what was being done and the cause of delay, and that the attorneys would withdraw from the case unless they were paid.

Coulter had no reason to expect that the attorneys for defendants would commence the trial until their fees were paid; they had repeatedly informed him that they must be paid in advance; they had the right to make such payment a condition in the contract of employment, and to insist upon its fulfillment. The case had been called for trial, and twice postponed on application of his attorneys, because of his failure to comply with their demand to be paid in advance; it was but partially or indifferently prepared for trial, because the necessary means were not furnished for that purpose. Coulter not only had failed to pay his attorneys as required by them, but had failed to comply with his contract with Harmer to furnish the money to defray the necessary expenses of the trial and the preparation for it. Under these circumstances, he had no right to be surprised, nor to the rights arising from a legal surprise. His own neglect, if not premeditated laches, was the cause of the acts complained of by him, and because of which he now claims a new trial; a pure and just administration of the law will not permit this kind of practice: *Brooks* v. *Douglass*, 32 Cal. 208; *Patterson* v. *Ely*, 19 Id. 28, 35, 36.

But it is urged by counsel in argument that Coulter authorized Hill to draw on him at sight for the necessary funds to pay attorneys, and that after he learned that they would refuse to accept the draft as payment, he transferred the money by telegraph to Salt Lake City. In answer to this, it may be said that if he saw fit, with a full knowledge of the facts, to wait until after the case had been called in its order for trial before making any effort to pay his attorneys, and without any assurance from them that the draft would be accepted as money, he did it at his own risk, with full knowledge of the consequences in case of a refusal to accept it in payment. Without some assurance on their part that the draft would be acceptable, he was not authorized by law to assume that it would be received as payment.

The affidavits tend to show, and it is undoubtedly true, that during the eighth, ninth, and tenth of November Harmer was negotiating a compromise of the case with the plaintiff, and that upon the failure of Coulter to forward the money on the morning of the tenth, and upon the withdrawal of the counsel for defendants, he closed the negotiations by agreeing to receive or by receiving five thousand dollars for the defendants in the cases. The payment of this money to Harmer made the judgment of the court no more and no less binding upon Coulter unless he agreed to it, by receiving a part of the money, or otherwise. It is not easy to see how Coulter was wronged by this. Harmer may have been disingenuous with the plaintiff, but Coulter has no ground of complaint; if he sees fit to approve or confirm the action, he can do so, but if not, his rights remain the same, unless the relations between them were such that Coulter was bound by Harmer's acts. If he was wronged, his remedy is not by motion for a new trial upon the ground of accident or surprise. It is a universally admitted rule of practice that no person is entitled to a new trial unless he has used due diligence to avoid the acts or grounds upon which he bases his motion. Apply this rule to the present case, and it may well be said that Coulter, upon being informed that the attorneys for the defense insisted upon their pay for services before trial, should have seen to it that they were so paid. And a failure on his part in this respect, and the withdrawal from the case because they

were not so paid, and the reasonable and probable consequences of such withdrawal, do not entitle him to a new trial.

The judgment of the district court is affirmed.

HUNTER, C. J., and EMERSON, J., concurred.